UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KIT digital, Inc. | ) | Case No. 13-11298 (REG) |
| | ) | |
| Debtor. | ) | |
| —————————————————— | ) | |
| | ) | |
| KIT digital, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 13-01368 (REG) |
| v. | ) | |
| | ) | |
| Invigor Group Limited, | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————— | ) | |


DECISION ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT[1]

APPEARANCES:

BRACEWELL & GIULIANI LLP
*Counsel for the Debtor*
1251 Avenue of the Americas
New York, New York 10020-1104
By:    Michael C. Hefter, Esq. (argued)
       Jennifer Feldsher, Esq.
       Stan Chelney, Esq.

HOGAN LOVELLS US LLP
*Counsel for Defendant Invigor*
875 Third Avenue
New York, New York 10022
By:    Peter A. Ivanick, Esq.
       Scott W. Reynolds, Esq. (argued)
       Allison H. Weiss, Esq.

ROBERT E. GERBER

———————————————

[1]    This written decision confirms and amplifies upon the oral decision that I issued after the close of
oral argument.  Because it had its origins in the originally dictated decision, it speaks as of the
time that I issued the original oral decision, and has a more conversational tone.

UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 11 case of debtor KIT digital, Inc. ("**KIT Digital**"), which was heard on a quicker than average basis to address real-time needs in KIT Digital's umbrella case (most significantly its confirmation), debtor KIT Digital moved for summary judgment on its request, pursuant to section 510(b) of the Code, that three anticipated claims of Invigor Group Limited ("**Invigor**") be subordinated.  In response, Invigor cross-moved for summary judgment in its favor on its request that I rule that its claims *not* be subordinated, notwithstanding section 510(b).  After Invigor's actual claims were filed, it now appears that there are two claims I need to address, one of which has two subcomponents.

Having reviewed the briefs and having heard oral argument, and having determined that there are no material disputed issues of fact, I rule that KIT Digital's summary judgment motion should be granted with respect to the first component of Claim 1117 (relating to the "**Top-Off**" obligation as defined below),[2] and otherwise denied.  I further rule that Invigor's summary judgment motion should be granted with respect to the "**Auckland Lease**"  obligation (also defined below), and otherwise denied.

Summary judgment in favor of either party with respect to Claim 1118 is denied, on ripeness and likely mootness grounds, without prejudice to renewal if and when Claim 1118 ever matters.

The bases for this determination follow.

---

[2]     The parties at times also refer to it as the "Top-Up" provision.

<u>Facts</u>

As I indicated, the underlying facts, at least those necessary to determination of these motions, are not in dispute. Neither side contended that an evidentiary hearing is necessary to determine the section 510(b) issues here presented, or that discovery is required prior to considering summary judgment under Fed. R. Civ. P. 56(d).

*1. Background*

KIT Digital, whose chapter 11 case was filed on April 25, 2013 in this Court, is in the business of digital television and media services. Its liquidity has been said to be very limited, and on June 17, I approved mechanisms for a sale of KIT Digital under a chapter 11 plan. A group led by JEC Capital (the "**JEC Group**") was approved as a stalking horse, with a potential breakup fee, but procedures were established under which higher bids for KIT Digital would be entertained. KIT Digital filed a reorganization plan, for a sale to the JEC Group or any higher bidder, with a confirmation hearing set for August 5.

KIT Digital's reorganization plan contemplates payment to creditors in full, and for a distribution to equity. Whether creditor claims can be paid in full—and, accordingly, whether a distribution can also be made to equity—depends in material part on the aggregate amount of Invigor's claims. To the extent, if at all, that Invigor's claims must be subordinated to other claims, any such determination would bear on KIT Digital's ability to satisfy one of the requirements for confirmation, that of section 1129(a)(11), colloquially referred to in the bankruptcy community as "feasibility."

*2. Securities Purchase Agreement*

In April, 2012 KIT Digital and Invigor (then known as Hyro Limited), entered into a Securities Purchase Agreement (the "**Agreement**"), which was subsequently amended on June 3, 2012.

-3-

Under the Agreement, Invigor agreed to sell, and KIT Digital agreed to buy, the stock of certain Invigor subsidiaries, said to be in the business of selling complex information technology services.  The price was fixed in the Agreement as $17,215,845 in Australian Dollars ("**AUD**").  Though Invigor states in its responsive papers that at the time of closing, the buyer and seller agreed to a price adjustment making that sale price AUD $16,346,238, that difference isn't material to this dispute.  What is important is that the Agreement provided that, at closing, KIT Digital would satisfy its purchase obligation by the issuance of KIT Digital stock, at a closing stock price of AUD $8.27 per share—a price that the parties defined as the "**Closing Stock Price.**"  So the total purchase price (AUD $17,215,845 as provided in the contract, or AUD $16,346,238 as possibly modified) would in the first instance be paid by taking the total sale price, dividing it by the Closing Stock Price, and by KIT Digital issuing its shares (which by that computation would mean 2,079,972 shares) in the amount necessary to satisfy that obligation.

I say "in the first instance," however, because under a provision of the Agreement, KIT Digital had the option—the right, but not the duty—to substitute cash for stock as the payment currency, and thus to pay any portion of the sale price in cash instead of stock.  The provision, Article 2.3(c) of the Agreement, provided that KIT Digital:

> in its sole and absolute discretion may, in lieu of issuing and delivering any or all Buyer Common Stock … pay cash in lieu thereof to [Invigor].[3]

---

[3]    Adv. Pro. No. 13-01368, ECF # 8-2 (Exhibit A to Affidavit of Fabrice Hamaide) ("Agreement").

At the time of the closing, on June 22, 2012, KIT Digital availed itself of that right to the extent of paying AUD $2 million in cash, and issued a somewhat lesser amount of stock (1,838,134 shares) as a result.

The Agreement had several other provisions of relevance to this dispute, two of which I need to address now.  One[4] is that the KIT Digital stock would be issued to Invigor in accordance with the SEC's Rule 144.[5]

Additionally, there was a "Top-Off" provision, providing for the potential issuance of additional stock to Invigor in the event of a Change of Control (as defined in the Agreement) or when the stock issued to Invigor could be sold to the public under Rule 144.[6]  The duty to issue additional stock would depend on whether a price computed at that later time (which the two sides defined as the "**Release Price**") had dropped relative to the Closing Stock Price.  Pursuant to Article 2.3(g) of the Agreement, KIT Digital and Invigor agreed that

> If the Release Price is less than the Closing Stock Price, then, subject to Section 2.3(c), [KIT Digital] shall issue to [Invigor] (immediately prior to the Change of Control or promptly following the date that the Buyer Common Stock is eligible for sale under Rule 144, as applicable) a number of additional shares of Buyer Common Stock equal to the number determined by [a formula specified in Article 2.3(g)].[7]

---

[4]     *See id.* at Articles 2.3(f), 2.3(g), and 8.4.

[5]     17 C.F.R. § 230.144.  I say solely by way of background that Rule 144 provides, in general terms, that limited amounts of securities can be issued in a private transaction, and subject to limitations under the Rule, without registration under the Securities Act of 1933 ( the "'**33 Act**").  After one year, Rule 144 allows for the permanent removal of the restriction except as to insiders.

[6]     *See* Agreement at Article 2.3(g).

[7]     *See id.*

KIT Digital and Invigor dispute whether the time for additional stock issuance under the Top-Off provision has come or not.  That's ultimately not material to this dispute, which involves solely whether any claim based on breach of the Top-Off provision would or would not be subordinated under section 510(b).  KIT Digital also disputes that it owes anything under the Top-Off provision.  But once again, that's not material to whether any claim for a Top-Off provision breach, if otherwise established, would be subordinated under section 510(b).

*3.  The Auckland Lease*

Another provision of the Agreement relevant to disputes here involves other obligations KIT Digital undertook under the Agreement—here with respect to an office lease, in Auckland, New Zealand.  Invigor alleges, and KIT Digital admits, that KIT Digital failed to make payments with respect to the Auckland Lease, though the parties dispute whether KIT Digital's failure to do so was justified.

After review of the supplemental 7056-1 statements, I find it to be undisputed that the Agreement provided that upon acquiring all of the stock in Invigor's subsidiaries, KIT Digital would become the tenant for all office space leases that were listed in a Schedule 3.7.1 of the Agreement (the "**Leased Properties**"), and that one of the leases for the Leased Properties was for the Auckland office (the "**Auckland Lease**").

Article 3.7.1(c) of the Agreement provided:

> To the extent the Leased Property is leased in the name of the Company, the relevant leases will be assigned or novated to one of the Subsidiaries prior to Closing and any security or other deposits associated with any Leased Property will be

simultaneously assigned to the applicable
Subsidiaries to whom the leases are assigned.[8]

The Auckland Lease was not transferred to any of the Invigor subsidiaries that were being sold prior to closing, and apparently for that reason (though I make no findings as to the reason), neither KIT Digital nor any of the subsidiaries were making payments on the Auckland Lease. To address this, in September 2012, Invigor's counsel wrote to KIT Digital requesting that KIT Digital immediately take "reasonable steps" to take over Invigor's legal and financial obligations in connection with the Leased Properties, including the Auckland Lease. Without dispute, KIT Digital failed to do so, and KIT Digital hasn't paid any of the costs associated with the Auckland Lease to date. KIT Digital contends that it has no obligation to do so, but whether it does or doesn't have that obligation, once more, isn't relevant to the issues on these motions.

*4. The 13D Filings*

Also potentially relevant to this controversy are two SEC filings with respect to Invigor's acquisition of KIT Digital shares, and Invigor's potential to acquire more. One was a filing under Schedule 13D (the "**Original Schedule 13D**")—which I say solely by way of background is a filing required under the Williams Act amendments to the Securities Exchange Act of 1934 (the "**'34 Act**"), requiring the reporting, among other things, of the acquisition of interests in a '34 Act reporting company above a specified size, and of the purpose of the acquisition and the acquirer's intentions. The second potentially relevant document was an amendment to the Original Schedule 13D (the "**Amended Schedule 13D**").

---

[8]        *See id.* at Article 3.7.1(c).

Invigor's Original Schedule 13D was dated October 29, 2012. As relevant here, Invigor said in Box 11 of the Original Schedule 13D that the "Aggregate Amount Beneficially Owned by Each Reporting Person" (*i.e.*, Invigor) was 6,474,520 shares.[9]

Likewise, in a footnote in the Original Schedule 13D, Invigor said that it "currently owns" (*i.e.*, owned as of October 29, 2012) 1,838,134 shares of common stock.[10] It continued to say, in that footnote: "Invigor has the right to acquire an additional number of shares of Common Stock [*i.e.*, common stock of KIT Digital] pursuant to the following formula…."[11] The formula to which Invigor referred was a paraphrase of Agreement Article 2.3(g). Invigor also stated, in Item 3 of the Original Schedule 13D, captioned "Source and Amount of Funds or Other Consideration," that KIT Digital had acquired all of the stock of Invigor's subsidiaries, "in consideration for 1,838,134 shares of Common Stock of KIT (representing approximately 3.2% of the outstanding stock issued by KIT)…," pursuant to the Agreement.[12]

Invigor's Amended Schedule 13D was dated December 28, 2012.[13] Box 11 of the Amended Schedule 13D now said that "Aggregate Amount Beneficially Owned by Each Reporting Person" (*i.e.*, Invigor) was 1,838,134 shares,[14] less than the earlier figure that had originally been 6,474,520 shares.

---

[9]    Case No. 13-11298, ECF # 310-4 (Exhibit C to Declaration of Michael Hefter) ("Original Schedule 13D").

[10]    *Id.* at 2 n.1

[11]    *Id.*

[12]    *Id.* at 3.

[13]    Case No. 13-11298, ECF # 310-4 (Exhibit D to Declaration of Michael Hefter) ("Amended Schedule 13D")

[14]    *Id.* at 2.

The Amended Schedule 13D continued to say, in a footnote, that "Invigor currently owns 1,838,134 shares," and went on to say, in that footnote that the Agreement, as amended, "granted Invigor the right to acquire an additional number of shares of Common Stock on December 22, 2012 pursuant to a formula set out therein."[15] The footnote further stated that KIT Digital had "refused to issue such additional number of shares," and that as a result, Invigor had amended its Schedule 13D.[16]

The Amended Schedule 13D further stated that Item 3 was "amended and restated in its entirety," and it then provided, in relevant part that

> On June 22, 2012, KIT acquired from Invigor all of the capital stock of Invigor's subsidiaries, in consideration of AUD $17,215,485.00 payable in shares of Common Stock of KIT (representing approximately 3.2% of the outstanding stock issued by KIT) … or, at KIT's election, in cash….[17]

And the Amended Item 3 further stated that the Agreement

> also contained a "top-up" provision …whereby the Issuer [*i.e.*, KIT Digital] agreed to issue to Reporting Person [*i.e.*, Invigor] additional shares of Common Stock on December 22, 2012 … if the Weighted Average Price (as defined in the Purchase Agreement) of the Common Stock fell below $8.10 per share.[18]

Finally, as relevant here, Amended Item 3 continued that:

> The issuer, however, has taken the position that it has no obligation to issue the additional shares under the Top-Up Provision.  The Reporting Person acknowledges that the Issuer does not intend to issue the additional shares under the Top-Up Provision and, accordingly, the Reporting Person's

---

[15]     *Id.* at 2 footnote unnumbered.

[16]     *Id.*

[17]     *Id.* at 3.

[18]     *Id.*

ownership in the Issuer is 1,838,134, amounting to a
percentage interest in the Issuer of approximately
3.2%.[19]

*5.  The Claims*

I turn now to the claims at issue.  Because Invigor hadn't yet filed its proofs of

claim as of the time KIT Digital filed its summary judgment motion, KIT Digital

commenced this adversary proceeding knowing only generally what those claims might

be.  KIT Digital based its motion on anticipated claims gleaned from Invigor's objections

to KIT Digital's disclosure statement, and from pleadings in a district court plenary

action Invigor had filed against KIT Digital in January of this year, before Judge Pauley

in the Southern District of New York.

Since the initial filing of KIT Digital's motion, Invigor has filed two proofs of

claim, asserting approximately $17 million in unsecured general unsecured claims:

Claim 1117, which seeks approximately $15.5 million for

(i) KIT Digital's alleged breach of the "Top-Off" provision

contained in the Agreement, and

(ii) KIT Digital's alleged failure to make lease payments required

under the Agreement with respect to the Auckland Lease; and

Claim 1118, which asserts that Invigor is owed $1,852,380 arising

out of a contract between KIT Digital and Partners for Growth III, L.P.

(**"Partners for Growth"**), Invigor's secured lender.

I understand there to also be a third claim, Claim 1116, but it is not before me on these

motions.

---

[19]    *Id.*

When Invigor filed its opposition to KIT Digital's motion for summary judgment,

Invigor also filed a cross-motion for summary judgment in its favor, asking for a mirror-

image ruling: that its Claim 1117 is *not* subordinated under section 510(b) of the Code.

### 6.  *Partners for Growth's Claim*

I mentioned a second claim, Claim 1118.  The parties do not address the contracts

involving Partners for Growth in any of their 7056-1 statements, but since Claim 1118

involves them, a brief discussion of those contracts is appropriate here.[20]

In March 2012, Partners for Growth entered into a secured lending facility with

Invigor.  Partners for Growth's collateral included the shares Invigor owned in the

subsidiaries it would sell to KIT Digital, and Partners for Growth held those shares under

a pledge to perfect its security interest in that collateral.

So that Invigor could recover and sell those shares to KIT Digital free and clear of

liens, and regain the shares of its subsidiaries from the pledge, Invigor entered into two

agreements to avoid prejudice to Partners for Growth that might otherwise result from the

release of Partners for Growth's security interest.  One, entered into between Invigor and

Partners for Growth, was a so-called "Consent Agreement" (but which I will call the

"**Invigor-Partners Agreement**").  A second, between Invigor and KIT Digital, was a so-

called "Make-Whole Agreement" (but which I will call the "**Invigor-KIT Agreement**").

Both were dated June 21, 2012.

Under the first agreement—the Invigor-Partners Agreement—Partners for Growth

provided conditional consent to Invigor's execution of the Agreement with KIT Digital

and Partners for Growth's release of its liens, so that Invigor's subsidiaries could be

---

[20]     While I believe these facts to be accurate, the parties' failure to document them to the same extent
that  they documented other facts in this controversy could affect the accuracy of my description
of them, though I think that it's much more than sufficiently accurate for the purposes here.

acquired free of any liens.  Under the second agreement, the Invigor-KIT Agreement,

KIT Digital agreed to pay Invigor cash equal to a Guaranteed Amount

(AUD $1.8 million, or US $1.852 million, as of the petition date) less the value of the

stock at the release date upon which it could be sold.  Invigor's Claim 1118 and Partners

for Growth's Claim 1144 assert the same claim for AUD $1.8 million under the Invigor-

KIT Agreement.

I emphasize that this was a cash obligation on KIT Digital's part, as compared

and contrasted to the Top-Off obligation I previously discussed, which would be paid in

stock unless KIT Digital chose to pay any portion of the Top-Off obligation in cash.

Any cash KIT Digital would pay Invigor under the Invigor-KIT Agreement would

then go on to Partners for Growth.  And separate and apart from that, Invigor later

executed an assignment to Partners for Growth of any amounts Invigor might recover in

connection with this separate obligation.  To avoid standing issues that might otherwise

result, each of Invigor and Partners for Growth filed proofs of claims—Invigor Claim

1118, and Partners for Growth Claim 1144—with respect to that AUD $1.8 million

amount, although they both acknowledge that the claims are duplicative and both

disclaim the desire to secure duplicative recoveries.

<u>Discussion</u>

I turn now to my conclusions of law.

A.  *Textual Analysis*

As usual, I start with textual analysis.  Section 510(b) of the Code provides:

For the purpose of distribution under this title,

a claim arising from

-12-

> rescission of a purchase or sale of a security
> of the debtor or of an affiliate of the debtor
> …,
>
> for damages arising from the purchase or
> sale of such a security, or
>
> for reimbursement or contribution allowed
> under section 502 on account of such a
> claim,
>
> shall be subordinated to all claims or interests that
> are senior to or equal the claim or interest
> represented by such security,
>
> except that if such security is common stock, such
> claim has the same priority as common stock.[21]

Several elements of the statutory text, important for any textual analysis, are noteworthy.

First, by reason of the "shall" in the second to last clause, subordination of any claims subject to section 510(b) is mandatory.

Second, to be covered under section 510(b), the claim must relate to a purchase or sale of a security *of the debtor* or *a debtor affiliate.* Thus, though it is sometimes the case (as it is here) that securities of another entity (here Invigor subsidiaries) are used as the currency to make payment in a transaction involving a purchase or sale of the securities of a debtor, it is the securities of the *debtor*, or *debtor affiliate*, that are the underpinnings of any section 510(b) determination.

Third, the claims subject to section 510(b) subordination are those "arising from" one of the three enumerated categories that follow those words. And the second of those three categories ("damages arising from the purchase or sale of such a security"), uses that same "arising from" language again.

---

[21]     Reformatted for readability and understanding.

Claims subject to section 510(b) are not limited to those for fraud, or even for rescission, which can be awarded for fraud or, in some cases, lesser offenses. While fraud at least normally justifies rescission, and claims for rescission are specifically listed amongst those that are subject to section 510(b) subordination, they are not the only basis for subordination under section 510(b). They are only one of the three. Importantly, claims for damages *arising from the purchase or sale* of "such a security"—*i.e.*, a security of the debtor or debtor affiliate—are also covered. I also note that the "arising from" language that we have in section 510(b) is broader than the clause "arising under," which might have been used instead (and which is used in other places in federal legislation, for example 28 U.S.C. § 1331 and § 1334), though with respect to the claims we have here, that distinction does not make a difference.

A number of decisions, some of which are discussed below, have said that the words "arising from" are ambiguous, but they are not ambiguous in the abstract. They are ambiguous or unambiguous when juxtaposed against particular factual situations. In particular, the extent to which "arising from the purchase or sale" is ambiguous depends on how divorced from the underlying sale the underlying claim is.

The clause "arising from the purchase or sale" is not ambiguous at all when it's applied to an alleged breach of the agreement of purchase or sale itself, or to a fraud that induced such an agreement. But it can become ambiguous when the claims are of a wholly different nature—such as when they're more tangentially related to the agreement of sale, or would not have arisen if an earlier purchase or sale agreement had never taken place.

-14-

As Judge Bernstein observed in In re *Granite Partners*, something "arises" from a source when it originates from that source.[22] He said that the phrase "arising from" signifies some causal connection.[23]  I agree with Judge Bernstein in that respect.[24]  And as I think Judge Bernstein's textual analysis of "arises" and "arises from" remains good law, even after the many cases that have followed it, I've considered it as an underpinning of the analysis that follows, though I'll consider later caselaw as well.

As Judge Bernstein observed in *Granite Partners*,[25] and Judge Walrath observed in In re *International Wireless Communications Holdings, Inc.*[26] (in a decision that was later affirmed by the district court and the Third Circuit), a literal reading implies that the injury must flow from the actual purchase or sale; a broader reading suggests that the purchase or sale must be part of a causal link although the injury may flow from a subsequent event.  But when the conclusions that flow from both standards are the same, as they are with respect to the Top-Off provision, there's no ambiguity.

---

[22]   208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) (**"*Granite Partners*"**) (citing Webster's New International Dictionary 117 (unabridged ed. 1976); Black's Law Dictionary 108 (6th ed.1990)).

[23]   *Id. Cf.* Black's Law Dictionary 108 (defining "arises out of").

[24]   Apart from that, I've stated, repeatedly, my view that predictability in the decisions of the various bankruptcy judges in this district is of great importance, and that I follow decisions of other bankruptcy judges in this district in the absence of clear error.  *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr. S.D.N.Y. 2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error."). *In re Houghton Mifflin Harcourt Pub. Co*., 474 B.R. 122, 134 n.38 (Bankr. S.D.N.Y. 2012) ("This Court has repeatedly gone on record in stating its views as to the importance of commercial predictability in this district, and of its personal view that it should follow the decisions of other bankruptcy judges in the Southern District of New York except in those very rare instances where the earlier decision was clearly mistaken.")  For that reason, I would follow Judge Bernstein's analysis in this respect even if I did not wholly agree with it, though in this instance I do.

[25]   *See* 208 B.R. at 339.

[26]   257 B.R. 739, 744-45 (Bankr. D. Del. 2001) (**"*International Wireless*"**), *aff'd*, 279 B.R. 463 (D. Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003).

*B  Caselaw and Secondary Authorities*

Thus, for the reasons I just discussed, I don't find section 510(b) to be ambiguous when it's to be applied to claims for failure to deliver stock under an underlying stock acquisition agreement, or for damages for fraud or misrepresentation in causing a stock acquisition agreement to come into being.  And to the extent that's true, then my duty is to simply apply section 510(b) in accordance with its plain meaning—which here would require me to subordinate at least all of Invigor's claims for any KIT Digital breaches of representations or warranties in the Agreement (though I think claims of that nature now have been abandoned, presumably because subordination of any such claims would so obviously be required), and for any breaches of the Top-Off obligation.

But with respect to the Auckland Lease obligations, which don't involve the duty to deliver stock of the debtor KIT Digital—and out of deference to the cases that have found section 510(b) be to be ambiguous without distinguishing between the facts that trigger section 510(b)'s application—I now turn to the caselaw and secondary authorities, for standards they might suggest that I should apply to the facts we have here.

Courts considering section 510(b) in cases where subordination wasn't plainly required by its terms have looked to section 510(b)'s purposes—as explained by the Second Circuit in *Med Diversified*,[27] to address the dissimilar risk and return expectations of shareholders and creditors, and the reliance of creditors on the equity cushion provided by shareholder investment.  Creditors and shareholders both take risks if a company heads south, but only shareholders get the benefit of the upside when a company

---

[27]    *See Rombro v. Dufrayne (In re Med Diversified, Inc.),* 461 F.3d 251, 256 (2d Cir. 2006) (**"Med Diversified"**).

-16-

succeeds.[28]  It was significant to the Second Circuit in *Med Diversified* that claimant

Rombro, who was seeking creditor status, "had the *potential* benefit of the proceeds of

the enterprise deriving from ownership of the securities."[29]  As the Second Circuit stated:

> We conclude that Rombro took on the risk and
> return expectations of a shareholder when he agreed
> to exchange securities in PrimeRx and employment
> claims for the shares of the debtor, and that his
> resulting claim for damages therefore must be
> subordinated.[30]

The Second Circuit continued:

> Once he entered a binding agreement obligating
> him to purchase shares of the debtor in return for his
> shares of PrimeRx, and to forego the significant
> cash compensation to which he otherwise was due
> upon termination, he became bound by the choice
> he made to trade the relative safety of cash
> compensation for the upside potential of
> shareholder status...[31]

And as the Third Circuit stated in its decision in *Telegroup*[32] (where shareholders

had filed claims seeking damages for the debtor's alleged breach of an agreement to use

its best efforts to ensure that their stock was freely tradable):

> [B]ecause claimants retained the right to participate
> in corporate profits if Telegroup succeeded, we
> believe that section 510(b) prevents them from
> using their breach of contract claim to recover the

---

[28]    *Id.* at 257 ("The creditor can only recoup her investment; the investor expects to participate in firm
profits." (quoting In re *Betacom of Phoenix, Inc.*, 240 F.3d. 823, 830 (9th Cir. 2001) (**"Betacom of
Phoenix"**))).

[29]    *Id.* at 256-57.

[30]    *Id.* at 256.

[31]    *Id.*

[32]    *Baroda Hill Investments, Ltd. v. Telegroup, Inc.* (*In re Telegroup, Inc.*). 281 F.3d 133 (3d Cir.
2002) (**"Telegroup"**).

value of their equity investment in parity with
general unsecured creditors.[33]

Another important purpose of section 510(b) is to prevent entities who bargained

for rights as equity holders, and who knew or are charged with knowledge that they'd be

junior to creditors, to bootstrap their claims to the creditor level by asserting claims

associated with their stock acquisitions.[34]  The Second Circuit has cautioned that "[w]hen

a corporation becomes bankrupt, the temptation to lay aside the garb of a shareholder, on

one pretense or another, and to assume the role of a creditor, is very strong, and all

attempts of that kind should be viewed with suspicion."[35]  And as Judge Gonzalez

observed in In re *Enron Corp.,*

> The reason for such caution, and the policy
> judgment behind section 510(b), is clear:
> "Congress enacted § 510(b) to prevent disappointed
> shareholders from recovering their investment loss
> by using fraud and other securities claims to
> bootstrap their way to parity with general unsecured
> creditors in a bankruptcy proceeding."[36]

Here Invigor has abandoned its breach of representations and warranties claims—

closely similar, in character, to claims for fraud—and has characterized its claims as for

breach of contract instead.  But the policy concerns I just quoted are no less applicable

here.  If KIT Digital had complied with its contractual duties, Invigor would have

received only stock, which would be junior to KIT Digital creditors in rights of recovery.

The underlying principles suggest that Invigor can't bootstrap its way to parity any more

by means of claims for breach of contract than it could for fraud.

---

[33]     *Id.* at 142.

[34]     *Id.*

[35]     *Jezarian v. Raichle* (In re *Stirling Homex Corp.*), 579 F.2d 206, 213 (2d Cir. 1978) (quoting
*Newton National Bank v. Newbegin*, 74 F. 135, 140 (8th Cir. 1896)).

[36]     341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006) (***"Enron"***) (quoting *Telegroup*, 281 F.3d at 142).

In opposing the premises on which KIT Digital seeks equitable subordination here, Invigor argues that while other Circuits (and it refers to the Third, in particular) have construed section 510(b) broadly, the Second Circuit does not.[37]  While I certainly agree that other Circuits have construed section 510(b) broadly, so has the Second Circuit, along with bankruptcy and district court judges in the Second Circuit.  I think that under any of the decisions at the Circuit Court of Appeals level—*Telegroup* and *International Wireless* in the Third Circuit, *Betacom of Phoenix* in the Ninth Circuit, and *Med Diversified*—those courts all endorse quite a broad reading of section 510(b), to effect its purposes of addressing the dissimilar risk and return expectations of shareholders and creditors; the reliance of creditors on the equity cushion that stockholders' investments provide; and to avoid bootstrapping of equity interests into creditor claims.

Invigor understandably recognizes in its answering brief[38] that Judge Gonzalez, in *Enron,* had expressed quite a broad standard for determining whether section 510(b) applies—having ruled, citing *Telegroup*, that for a claim to fall within the scope of section 510(b), there should be some nexus or causal relationship between the claim and the purchase of the security.[39]  Invigor found some significance in the fact that Judge Gonzalez, in *Enron*, had quoted the Third Circuit's *Telegroup* decision as part of his analysis, which Invigor described as applying "a far more expansive test" for determining whether section 510(b) would apply than the Second Circuit adopted in *Med*

---

[37]      Adv. Pro. No. 13-01368, ECF #15 (Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment) ("Answering Brief") at 18.

[38]      *Id*.

[39]      *See Enron*, 341 B.R. at 152.

*Diversified*.[40]  And Invigor found some significance in the fact that *Enron* pre-dated *Med
Diversified* by three months.  Invigor suggested to me that *Enron* was decided without the
benefit of *Med Diversified* (which is plainly true), but also suggested that *Enron* and *Med
Diversified* were somehow in conflict.  I disagree in that latter respect.

When *Med Diversified* was issued, three months later, *Med Diversified* cited
*Enron* approvingly six times.[41]  And in each of those instances the Second Circuit, in *Med
Diversified*, did not criticize, disagree with or even limit *Enron* in the slightest.  To the
contrary, *Med Diversified* described *Enron* as "extraordinarily thorough" and "helpful,"[42]
and it went on to compare the *Med Diversified* facts, at some length, with those in *Enron*,
effectively using *Enron* as a benchmark in a fact by fact comparison.  The *Med
Diversified* court also cited *Telegroup* approvingly six times.[43]  It did not question
*Telegroup* in any way either.  I see no evidence of a difference in standards that would in
any way be meaningful in this case, if not also in any other.

In that same decision in *Med Diversified*, the Second Circuit also affirmed
decisions by Bankruptcy Judge Stan Bernstein in the Eastern District of New York and
District Judge Joanna Seybert in that district subordinating, under section 510(b), claims
by a former executive arising from the debtor's failure to issue debtor common stock to
him in exchange for his stock in another company, as provided by a termination
agreement.[44]  The *Med Diversified* court agreed with the lower courts' conclusion that
such a claim "arises from" the purchase of the debtor's stock within the meaning and

---

[40]        Answering Brief at 18.

[41]        *See* 461 F.3d at 255 (twice), 256, 257 (at length), 258, 259.

[42]        *Id.* at 257.

[43]        *See Id.* at 254, 255, 256, 257, 258, 259.

[44]        *Id.* at 252-53.

purpose of section 510(b).[45]   The *Med Diversified* court expressly endorsed a broad

reading of section 510(b), stating (with immaterial portions pruned) that

> In a well-reasoned, unpublished decision … the
> bankruptcy court (Bernstein, Bankr. J.) granted
> summary judgment to the trustee and subordinated
> Claim 661. Judge Bernstein determined, in
> accordance with case law *broadly construing*
> section 510(b), that "the claim need not flow
> directly from the securities transaction, but can be
> viewed as 'arising from' the transaction if the
> transaction is part of the causal link leading to the
> injury," …. The court concluded that because
> Rombro's claim was based on the debtor's alleged
> failure to issue Rombro shares of its stock as
> required by the termination agreement, there was a
> causal link between the securities transaction and
> the injury.[46]

Likewise, in *Med Diversified* the Circuit affirmed Judge Seybert's order affirming Judge

Bernstein, noting that she "likewise determined that section 510(b) is to be construed

*broadly* because it is a remedial statute intended "to prevent shareholders from changing

their claims into creditors' claims.""[47]   And the *Med Diversified* court expressly stated that

because the executive's claim for damages wasn't a fixed amount, "but rather connected

to the value of debtor's stock, we are inclined to read section 510(b) *broadly* to include

his claim for damages."[48]   And again: "In conclusion, we interpret section 510(b) *broadly*

to require subordination of the claim at issue."[49]

In short, the Second Circuit, in *Med Diversified*, spoke in terms of construing

section 510(b) broadly four times.   There's no Circuit split here.

---

[45]        *Id.* at 253.

[46]        *Id.* at 254 (emphasis added).

[47]        *Id.* (emphasis added).

[48]        *Id.* at 257-58 (emphasis added).

[49]        *Id.* at 259 (emphasis added).

A broad reading of section 510(b) is also supported by the leading bankruptcy treatise, *Collier*.  *Collier* observes that

> Courts have viewed [the "arising from"] language as ambiguous, generally interpreting the provision broadly to include a wide variety of causes of actions arising out of securities transactions.  Under this broad reading, the claim need not flow directly from the securities transaction or arise contemporaneously with the purchase or sale of a security, but will be viewed as "arising from" a securities transaction if the transaction is part of the causal link leading to the injury.[50]

*Collier* further states that:  "The clear mandate of section 510(b) is that shareholder claimants will not be permitted to elevate their interests from the level of equity to general claims."[51]

## C.  Application to Facts Here

Applying these principles to the claims in question, I rule that section 510(b) applies with respect to the Top-Off obligation, but doesn't with respect to the Auckland Lease.

### 1.  Top-Off Obligation

The first component of Claim 1117, which seeks damages for the failure to deliver more stock under the Top-Off provision, must be subordinated under section 510(b).  Invigor seeks to elevate, to the level of a claim, KIT Digital's failure to provide Invigor with more stock under the Agreement, which of course was an agreement for the sale of securities.

---

[50]   Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("***Collier***") ¶510.04[3] (footnotes omitted).

[51]   *Collier* at ¶ 510.04[1].

I come to that view for several reasons. First, it is required under the plain meaning of section 510(b), in a factual context where section 510(b)'s application is not at all ambiguous. While section 510(b)'s application may be more debatable when claimants assert rights other than rights to acquire stock, or to recover alleged deficiencies in the stock's value, the Top-Off obligation claims here are for both of those things.

Second, we reach the same conclusion even if we regard 510(b) as ambiguous and apply caselaw standards, including those developed to address instances where section 510(b)'s ambiguity can affect the result. Applying *Med Diversified*, for example, by agreeing to accept stock instead of cash for any shortfall required by the Top-Off provision, Invigor subjected itself to the greater risk that the price of the stock it would then receive might go down. It also would get the benefits if the price of the stock went up. Whether we look at the original Agreement, with the bundle of rights it contained, or the Top-Off provision in greater isolation, we still see Invigor subjecting itself to the risks and rewards of equity ownership.

Similarly, KIT Digital creditors could legitimately take comfort in the equity cushion a contract of the nature of the Agreement provided. In particular, they could take solace in the fact that KIT Digital could satisfy its Top-Off obligation with stock, and not use precious cash, if KIT Digital's solvency or liquidity was in jeopardy. And with respect to the additional rationale I identified a moment ago, KIT Digital creditors would understandably be upset if Invigor could elevate an obligation that their debtor could satisfy in stock into an unsecured claim—senior to the stock Invigor had agreed to accept—and thus to share scarce estate resources that might be available with them.

Third, we must look at the nature of Invigor's deal. Invigor didn't bargain for the difference in value in cash. It bargained for the right to receive more stock, and the gravamen of its claim is that it didn't get it. But all that Invigor was entitled to demand was more stock. If KIT Digital had simply given Invigor more stock (which was KIT Digital's right), KIT Digital would have fully complied with its contractual obligations, and Invigor would have no corresponding rights as a creditor, rather than as an equity security holder. And Invigor fully understood its contractual rights to be those that would get it more stock ownership. That's plain when we look at the two Schedule 13D filings Invigor made, before this matter got into bankruptcy litigation. In the Original Schedule 13D, Invigor described its then current stock ownership, and it "right to acquire an additional number of shares," pursuant to a formula it described.[52] Likewise, in the Amended Schedule 13D, Invigor effectively said the same thing, in the same place (and again on the next page),[53] though Invigor went on to say that KIT Digital had taken the position that it had no obligation to issue the additional shares.

Fourth, looking at closely similar cases—the *International Wireless* cases[54] and In re *Kaiser Group International, Inc.*[55]—they too compel section 510(b) subordination here. The *International Wireless* cases rejected contentions that a breach of an agreement requiring the delivery of additional shares could be asserted as a claim.[56] Rather, they

---

[52]     *See* Original Schedule 13D at 2 n.1.

[53]     *See* Amended Schedule 13D at 2 footnote unnumbered, Item 3.

[54]     257 B.R. 739 (the decision by Judge Walrath at the bankruptcy court level); 279 B.R. 463 (the decision by Judge Farnan, affirming her, at the district court level), and 68 Fed. Appx. 275 (the decision by the Third Circuit, affirming Judges Walrath and Farnan, by a panel including Judges Ambro and Rendell, two well known experts in bankruptcy law).

[55]     260 B.R. 684 (Bankr. D. Del. 2001) (*"Kaiser Group"*) (another decision by Judge Walrath).

[56]     257 B.R. at 743-44; 279 B.R. at 467-68.

subordinated under section 510(b).  They found there—as I rule here—that claims for nondelivery of an equity security were within the scope of section 510(b).[57]

Judge Walrath ruled similarly in *Kaiser Group*.[58]  Relying on her earlier ruling in *International Wireless* (which had not yet been affirmed by the district court or the Third Circuit, though it subsequently was, by each), she concluded that claims for breach of a debtor obligation to pay cash or issue additional shares to assure shareholders the full value of a merger had to be subordinated under section 510(b).[59]

And the Ninth Circuit's decision in *Betacom of Phoenix* is to the same effect, subordinating damages for non-delivery of an equity security.[60]

It is no answer for Invigor to rely on the provision in the Agreement which gave KIT Digital the right to satisfy its obligations in cash, rather than stock.  That was an option KIT Digital had but Invigor did not—and it was at KIT Digital's sole discretion. Invigor bargained to accept payment under the Agreement in stock, and, as in *Med Diversified*, became "bound by the choice [it] made to trade the relative safety of cash compensation for the upside potential of shareholder status."[61]  In *Kaiser Group* too, the duty was "to pay cash or issue additional shares."[62]   Subordination under section 510(b) was still required.[63]  What is important is that Invigor agreed to accept stock in performance of the debtor's duty—an agreement that would be of importance to any

---

[57]     68 Fed. Appx. at 278 ("By agreeing to receive shares or warrants as consideration for their PMCL shares, F&W agreed to bear shareholder risk.").

[58]     *See* 260 B.R. 684.

[59]     *Id.* at 687.

[60]     *See* 240 F.3d at 823.

[61]     461 F.3d at 256.

[62]     260 B.R. at 687.

[63]     *Id.* at 689.

creditor.  And if the debtor KIT Digital had complied with its duty to deliver stock, Invigor would have no cause to complain.

Against that weight of authority, Invigor relies on two cases, In re *NationsRent, Inc.*,[64] and *CIT Group v. Tyco International Ltd.* (In re *CIT Group*).[65]  But I find each distinguishable.  In *NationsRent*, Judge Gross in Delaware declined to subordinate under section 510(b).[66]  But there the duty was in an agreement separate and apart from the stock purchase agreement, and the claimant did not have the right to common stock. Rather, the make-whole payment there was to be paid in *cash*, based on "the value of the common stock."[67]  *NationsRent* didn't involve a bargain to acquire stock; stock value was merely the index by which the monetary obligation was measured.[68]

Similarly, *CIT Group* involved a duty to pay money under a tax agreement, which was one of several documents that had been executed at the time of a corporate spinoff.[69] It did not involve a contract entitling the claimant to stock.  In fact, in *CIT Group*, Judge Gropper distinguished *International Wireless* on the exact grounds that I find *International Wireless* to be applicable here.  He distinguished *International Wireless* on the grounds that the latter was an agreement by the debtor to assure the claimant that the debtor's stock had a sufficient value,[70] which was not the case in *CIT Group* but is exactly the case here.  Because the underlying sale of stock in *CIT Group* was an IPO to third party purchasers, and not to the claimant Tyco, Judge Gropper found the Tyco claim

---

[64]     381 B.R. 83 (Bankr. D. Del 2008) (***"NationsRent"***).

[65]     460 B.R. 633 (Bankr. S.D.N.Y. 2011) (***"CIT Group"***).

[66]     381 B.R. at 92.

[67]     *See id.* at 86.

[68]     *Id.* at 92.

[69]     460 B.R. at 636.

[70]     *See id*. at 640.

to be outside "even a broad reading of the statute."[71]  Here, by contrast the underlying

sale, and prospective further delivery, of the stock in question was to the claimant

Invigor, and not to unnamed parties in the outside world.

### 2. Auckland Lease Obligation

The second component of Claim 1117, whose analysis is more debatable,

involves Invigor's claim for reimbursement of rent and associated expenses with respect

to the Auckland Lease.  KIT Digital's obligations to Invigor with respect to the Auckland

Lease arose, as we all know, under the same Agreement pursuant to which Invigor

acquired its rights to KIT Digital stock.  There's no doubt that the Auckland Lease

obligation was part and parcel of the underlying Agreement, which was an agreement for

the purchase of a security.

But the covenant allegedly breached, unlike the Top-Off obligation just discussed,

while an element of the deal as a whole, had nothing to do with the stock of the debtor—

which was the stock being acquired.  The covenant didn't obligate the delivery of any

KIT Digital stock, and the delivery of KIT Digital stock required in the original Article

2.3 of the Agreement, and under Article 2.3(g), embodying the Top-Off provision, did

not have the requisite causal link to obligations with respect to the duty to pay on the

lease.

I analyze the Auckland Lease obligation in the same fashion I analyzed that of the

Top-Off provision.  With respect to this application of section 510(b), the statute is

ambiguous.  I can't apply plain meaning, because we're not talking about damages

arising from the purchase or sale of debtor stock; we're really talking about damages

---

[71]        *Id.* at 642.

arising from the alleged breach of an obligation that was *part of a contract that involved* a sale of debtor stock, or of an obligation that was part of a larger transaction that involved a sale of debtor stock.  That doesn't mean that section 510(b) is necessarily inapplicable.  But because the Auckland Lease covenant is considerably more divorced from covenants relating to delivery of stock, such as those in the Top-Off provision, it means that we have to move on to the policy analysis embodied in cases like *Enron*, *CIT Group*, and, of course, *Med Diversified*.

      *Med Diversified* suggests, rather strongly, that I should not subordinate.  The duty to pay the Auckland Lease expenses had nothing to do with the risks of investment in KIT Digital's business, or the gains to be enjoyed as a result, or the greater exposure to risk that acquirors of stock assume relative to those who are classic creditors.  And undertaking a contractual obligation like the Auckland Lease expense did not provide KIT Digital creditors with an equity cushion.  In fact, it was the opposite; such a covenant, part of a larger transaction in which KIT Digital acquired Invigor businesses, resulted in a financial *drain* on the acquiring company KIT Digital, not a capital infusion.

      I also can, and should, look at decisions at the bankruptcy court level for any more specific guidance they provide.  *Enron* involved quite different facts, with each of the claimants having acquired securities—their options—of the Debtor.[72]  But *Enron* did provide a standard capable of being applied more generally—one requiring me to consider whether there's "some nexus or causal relationship between the claim and the purchase of the security ...."[73]  The same "causal link" requirement was articulated in

---

[72]     341 B.R. at 145.

[73]     *Id.* at 152, 161 (quoting *Telegroup*, 281 F.3d at 138).

*Med Diversified.*[74]  But here I cannot find the requisite "causal link."  In fact, there are no

links, except insofar as they may be deemed to arise from different covenants in the same

contract, and are part of the same, larger transaction.  Those limited links result, at least

arguably, in a "nexus" (albeit a very attenuated one), but they don't result in a "causal

relationship."  And here I think the latter is lacking.

And while I considered *CIT Group* to be distinguishable with respect to Invigor's

Top-Off rights, with respect to this different issue I consider *CIT Group* to be relevant,

helpful, and ultimately controlling.  In *CIT Group* too, duties that arose under the Tax

Agreement were undertaken as part of a larger transaction under which the IPO

represented the requisite sale of debtor securities.[75]  So in *CIT Group,* there was a nexus,

but that nexus was insufficient.  What Judge Gropper found important was the extent—

which he regarded as insufficient—to which duties under the Tax Agreement had a

connection to the debtor's sale of stock.[76]  He found none there, and I can find none here

either.  Judge Gropper found it meaningful that the claimant hadn't entered into a

transaction with the debtor to acquire the debtor's stock,[77] and while here Invigor did, its

Auckland Lease covenant had no stock purchase attributes.  It was simply part of the

larger transaction—and in substance, an additional currency, *beyond stock,* that KIT

Digital agreed to provide in order to acquire the Invigor subsidiaries.

While recognizing, as CIT had argued, that nothing in section 510(b)'s text

requires a subordinated claimant to be a shareholder, Judge Gropper observed in *CIT*

---

[74]     461 F.3d at 254.

[75]     460 B.R. at 635-36.

[76]     *Id.* at 639-40.

[77]     *Id.* at 641.

*Group* that "cases that have held that shareholder status is not necessary for subordination have invariably been grounded on the deprivation of the opportunity to become a shareholder."[78]  That's not at all fatal to KIT Digital's position with respect to the Top-Off obligation claim—which was the paradigmatic example of the deprivation of the opportunity to become a shareholder, or at least a shareholder to a greater extent—but it's fatal here.  Taking on lease obligations has nothing to do with acquiring more stock.

If Invigor can otherwise establish an allowed claim for losses associated with the Auckland Lease, that claim will not be subordinated under section 510(b).

### 3. *Claim 1118*

Turning now to Claim 1118, which is admittedly duplicative of Claim 1144, the motions, with respect to which the briefing has been much too thin in any event,[79] suffer from ripeness and potential mootness issues.  All seem to agree that Claims 1118 and 1144 are duplicative and can't both be allowed, and nobody seemed to quarrel with my view (albeit a tentative one) that Claim 1144, filed by Partners for Growth, would be the one much more likely to survive.  But KIT Digital did not seek summary judgment with respect to Partners for Growth's Claim.  So now I'm asked to determine subordination with respect to Invigor's claim—a claim that's likely to be disallowed, at least on duplicative claim grounds, and under circumstances where KIT Digital didn't move with respect to the claim that mattered.

---

[78]    *Id.* at 642.

[79]    After delivery of my dictated decision, Invigor's Counsel reminded me that Debtor KIT Digital did not move for summary judgment as to Claim 1118 in its original motion, and only addressed Claim 1118 in its reply brief.  Thus Invigor did not have an opportunity in its opposition to the summary judgment motion to address this issue—which helps to explain the lack of briefing.  As I remarked on the record, that would simply be another reason for me not to grant summary judgment.  I also noted that if and when Claim 1118 needed to be addressed, all sides would have a full reservation of rights.

That presents decisive ripeness and mootness issues.  I won't decide anything

further with respect to Claim 1118 now.  Summary judgment as to Claim 1118 is denied,

without prejudice to renewal if and when it ever matters.

* * *

An order has been entered implementing these rulings.

Dated:  New York, New York                        _s/Robert E. Gerber_____
        September **5** , 2013                        United States Bankruptcy Judge